IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

PNC BANK, NATIONAL ASSOCIATION,   )
     Plaintiff,                    )
                               )
        v.                      )     Civil No. 3:17cv311
                               )
DOMINION ENERGY MANAGEMENT, INC.,  )
*et al.*,                        )
     Defendants.             )
                               )

## MEMORANDUM OPINION

Defendants Dominion Energy Management, Inc. ("Dominion"); Gerald Mwangi ("Mwangi"), President of Dominion; and, Youri Brun ("Brun"), Secretary and Vice President of Dominion, (collectively, "Defendants") entered into four commercial loans with Plaintiff PNC Bank, National Association ("PNC"), whereby PNC loaned funds and extended lines of credit to Defendants for business and commercial purposes. When Defendants defaulted on the terms of the loan documents, PNC brought this action. PNC now seeks summary judgment and the matter is ripe for disposition.

Apart from a now-cured discovery dispute pertaining to the admissibility of evidence used by PNC in support of its Motion for Summary Judgment, neither Dominion nor Brun oppose PNC's Motion for Summary Judgment. Mwangi argues that the Court cannot hold him personally liable for any of PNC's claimed damages, because PNC fraudulently induced Mwangi to enter into certain loan documents and an individual guaranty. Specifically, Mwangi claims that PNC loan officers misrepresented to him that he would not be personally liable for any of Defendants' debts. PNC asserts that Mwangi's fraud claims fail, because his independent review

of the loan documents and the guaranty renders Mwangi's reliance on the loan officer's statements unjustifiable. Neither Mwangi's self-serving statements nor any other evidence put forth by the parties raises a genuine issue of material fact that would prevent a reasonable factfinder from returning a verdict in PNC's favor. Consequently, for the reasons set forth below, the Court hereby GRANTS PNC's Motion for Summary Judgment (ECF No. 25).

## I. Factual Background[1]

The Court views the following facts in the light most favorable to Defendants, the non-movants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Defendants' Obligations to PNC

#### 1. SBA Loan

On December 16, 2009, Defendants, jointly as borrowers, entered into an agreement with PNC, whereby PNC, with authorization from the U.S. Small Business Administration ("SBA"), loaned $1,465,000.00 to Defendants for commercial and business purposes ("SBA Loan"). (Am. Compl. (ECF No. 24) ¶ 9.) The terms of the SBA Loan are set forth in the SBA Loan Agreement and the SBA Note (collectively, the "SBA Loan Documents"), both dated December 16, 2009. (PNC's Mem. at 3, Exs. A (Affidavit of Stephen Bar) (hereinafter, "Barr Aff."), A-1 ("SBA Loan Agreement"), A-2 ("SBA Note").) Also on December 16, 2009, Brun executed a

---

[1]     Pursuant to Local Rule 56(B), a brief in support of a motion for summary judgment must contain a section listing all undisputed material facts. E.D. Va. Loc. R. 56(B). Briefs in response to a motion for summary judgment must contain a section listing those facts "as to which it is contended that there exists a genuine issue necessary to be litigated[.]" *Id.* When ruling on a motion for summary judgment, "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* PNC's brief contained a section of undisputed facts. (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("PNC's Mem.") (ECF No. 25-1) at 2-14.) Defendants responded by listing facts in dispute. (Defs.' Resp. to PNC's Mot. for Summ. J. (ECF No. 30) ("Defs.' Resp.") at 1-3; Mwangi's Opp'n to Pl.'s Mot. for Summ. J. ("Mwangi's Opp'n") (ECF No. 35) at 1-2.) Where Defendants did not dispute facts listed by PNC, the Court accepts PNC's recitation as undisputed.

Guaranty and Suretyship Agreement ("2009 Brun Guaranty"), in which Brun guaranteed prompt payment and performance of all Dominion's loan obligations to PNC, including Dominion's obligations under the SBA Loan Documents. (PNC's Mem. at 3; Barr Aff., Ex. A-3 ("2009 Brun Guaranty").)

### 2. VISA Commercial Card Agreement

On April 9, 2014, Dominion entered into another commercial loan agreement with PNC, whereby PNC extended a credit limit of $500,000.00 to Dominion ("Visa Commercial Card Agreement"). (PNC's Mem. at 5-6; Barr. Aff., Ex. A-6 ("Visa Commercial Card Agreement") at 1, 14.) Brun, pursuant to his obligations under the 2009 Brun Guaranty, and Mwangi each personally guaranteed the Visa Commercial Card Agreement. (PNC's Mem. at 6.) Brun personally guaranteed the Visa Commercial Card Agreement through the 2009 Brun Guaranty, which made Brun liable for the prompt payment and performance of all loan obligations that Dominion owed to PNC, including future obligations. (Am. Compl. ¶ 42; 2009 Brun Guaranty at 1, 6.)

On April 9, 2014, Brun also executed a Consent of Guarantor ("2014 Brun Consent of Guarantor") to further secure the Visa Commercial Card Agreement. (PNC's Mem., Ex. A-7 ("2014 Brun Consent of Guarantor").) That same day, Mwangi personally secured the Visa Commercial Card Agreement by agreeing and signing a Guaranty and Suretyship Agreement ("2014 Mwangi Guaranty"), under which Mwangi ensured the prompt payment and performance of all of Dominion's loan obligations to PNC, including the Visa Commercial Card Agreement. (Am. Compl. ¶ 43; PNC's Mem., Ex. A-8 ("2014 Mwangi Guaranty").) On December 1, 2014, PNC amended the Visa Commercial Card Agreement via letter by reducing Dominion's credit limit to $200,000.00. (Am. Compl. ¶ 46; Barr. Aff., Ex. A-9.)

### 3.     Line of Credit and Term Loan

Shortly after PNC reduced Dominion's credit limit under the Visa Commercial Card

Agreement, Defendants entered into another agreement with PNC to open a second line of credit

for $400,000.00 ("Line of Credit"). (PNC's Mem. at 9.)  The terms of the Line of Credit are set

forth in the Commercial Loan Agreement, dated December 16, 2009, and the Line of Credit

Note, dated December 12, 2014. (PNC's Mem. at 9; Barr Aff., Exs. A-13 ("Commercial Loan

Agreement"), A-14 ("Line of Credit Note".)[2]  Also on December 12, 2014, Brun executed a

Guaranty and Suretyship Agreement ("2014 Brun Guaranty") to secure repayment of the Line of

Credit Note. (PNC's Mem. at 9-10; Barr. Aff., Ex. A-15 ("2014 Brun Guaranty").)  Mwangi

also personally guaranteed Dominion's loan obligations under the Line of Credit Documents

through the 2014 Mwangi Guaranty. (PNC's Mem. at 9; 2014 Mwangi Guaranty § 1(a).)

Finally, on December 12, 2014, PNC agreed to loan Dominion $200,000.00 ("Term

Loan"). (PNC's Mem. at 11-12.) The terms of the Term Loan are set forth in the Commercial

Loan Agreement and the Term Note. (PNC's Mem. at 11-12, Ex. A-16 ("Term Note");

Commercial Loan Agreement.)  Brun and Mwangi each personally guaranteed Dominion's

obligations under the Term Loan pursuant to the 2014 Brun Guaranty and 2014 Mwangi

Guaranty. (2014 Mwangi Guaranty § 1(a); 2014 Brun Guaranty § 1(a).)

### B.     Defendants' Default

By loaning funds and extending credit to Defendants, PNC performed its obligations

under the SBA Loan Documents, the Visa Commercial Card Agreement, the Commercial Loan

---

[2]     The Commercial Loan Agreement lists December 16, 2009 as the date of execution.
(Commercial Loan Agreement at 1.) PNC asserts that the parties executed the Commercial Loan
Agreement on December 12, 2014. (PNC's Mem. at 9, 11.)  Defendants do not dispute the date
that they signed the Commercial Loan Agreement nor does the date of execution affect the
Court's analysis.

4

Agreement, the Line of Credit Note and the Term Note (collectively, the "Loan Documents"). (PNC's Mem. at 1-2.) Under the terms of the Loan Documents, events of defaults include, *inter alia* — (i) Defendants' failure to make timely payments, (ii) Defendants' default on any other loan with PNC; or, (iii) "the occurrence of any event which would constitute a material adverse change in [Dominion's] business operations, including financial." (Am. Compl. ¶¶ 18, 48, 74, 99; SBA Note § 4; Visa Commercial Card Agreement § 13; Line of Credit Note § 9; Term Note § 8.) In the event of default, the Loan Documents provided that PNC could demand immediate payment of outstanding debts, collect any amounts owed from any borrower or guarantor, or file suit and obtain judgment. (SBA Note § 5; Visa Commercial Card Agreement § 14; Line of Credit Note § 9; Term Note § 8.)

The following events of default occurred: First, in September 2016, Defendants failed to make timely payments on the Visa Commercial Card Agreement. (PNC's Mem. at 4; Barr Aff., Ex. A-10 (Dominion's billing records from July, August and September 2016)). This constituted an event of default under the Visa Commercial Card Agreement itself, as well as under § 4(a) of the SBA Note (defaulting on any other loan with PNC constitutes an event of default), § 9(ii) of the Line of Credit Note (same) and § 8(ii) of the Term Note (same). (SBA Note § 4(a); Visa Commercial Card Agreement § 13(a); Line of Credit Note § 9(ii); Term Note § 8(ii).)

Second, Dominion fell behind on its rent payments to Robert Snydor ("Snydor"), the property owner of the office space that Dominion rented in Ashland, Virginia. (Am. Compl. ¶¶ 16-17, 21-22; Pl.'s Reply Br. in Supp. of its Mot. for Summ. J. ("PNC's Reply") (ECF No. 36) at 2-6, Exs. A (Suppl. Barr Aff.); A-1 ("Landlord Emails"); A-2 ("Barr Email"); A-3 ("Notice of Lease Default").) Dominion failed to make rent payments to Snydor in June, July, August and September 2016, which ultimately resulted in Dominion's eviction from its business

office. (Am. Compl. ¶¶ 21-22.) PNC considered Dominion's eviction "a materially adverse change in Dominion's business operation." (Am. Compl. ¶¶ 54, 78, 103.) This constituted an event of default under the SBA Note, the Visa Commercial Card Agreement, the Line of Credit Note and the Term Note. (SBA Note § 4(K); Visa Commercial Card Agreement § 13(k); Line of Credit Note § 9(viii); Term Note § 8(viii).) PNC also believed that Dominion's breach of its lease and subsequent eviction "materially affected Defendants' ability to repay" their debts. (Am. Compl. ¶ 22.) This constituted an event of default under the SBA note, which held Defendants in default if they "[d]efault[ed] on any loan or agreement with another creditor, if [PNC] believes the default may materially affect [Defendants'] ability to pay this Note." (SBA Note § 4(F).)

Following these events of default, on October 6, 2016, PNC sent Dominion a termination notice (to Mwangi's attention), notifying Mwangi of Dominion's Default and demanding payment of all outstanding debts due under the Visa Commercial Card Agreement. (PNC's Mem., Ex. A-11.) That same day, PNC sent two notices of default to Mwangi and Brun. (Am. Compl., Ex. 4 ("SBA Loan Default Notice"); PNC's Mem., Ex. A-12 ("Dominion Notice of Default").) In the first notice of default, PNC demanded repayment of the SBA Loan in full, plus accrued interest and other charges, totaling $561,491.25. (SBA Loan Default Notice at 1-3.) In the second notice of default, PNC demanded repayment of the other three commercial loans in full, plus accrued interest and other charges totaling the following amounts — (i) $ 401,302.25 for the Line of Credit; (ii) $136,115.28 for the Term Loan; and, (iii) $199,896.00 for the Visa Commercial Card Agreement. (Dominion Notice of Default at 1, 3.) Both notices also demanded that Defendants pay PNC's attorneys' fees in accordance with the requirements of the Loan Documents. (SBA Loan Default Notice at 2; Dominion Notice of Default at 1.)

## II.    PROCEDURAL HISTORY

On April 20, 2017, PNC filed suit against Defendants in this Court, alleging four counts of breach of contract. (Compl. (ECF No. 1).) By Order of the Court (ECF No. 23), on November 30, 2017, PNC filed its Amended Complaint, clarifying the grounds for diversity jurisdiction in this matter. (Am. Compl. at 1-2.) On December 1, 2017, PNC filed its Motion for Summary Judgment. (PNC's Mot. for Summ. J. (ECF No. 25).) In their response, Defendants alleged that PNC did not comply with the Court's Scheduling and Pretrial Order (ECF No. 15), by not timely producing certain evidence of Defendants' default in initial disclosures. (Defs.' Resp. to PNC's Mot. for Summ. J. (ECF No. 30) ("Defs.' Resp.") at 3-5.) Accordingly, on January 5, 2018, the Court re-opened discovery for the limited purpose of allowing the parties to take certain additional, written discovery and affording PNC the opportunity to depose Mwangi, if PNC so chose. (ECF No. 34 ("January 2018 Order").) The Court also permitted the parties to re-file their respective response and reply to PNC's Motion for Summary Judgment, if so desired. (January 2018 Order.) On January 19, 2018, only Defendant Mwangi elected to re-file his response, alleging that the Court cannot hold him personally liable for Defendants' default on the loans, because PNC fraudulently induced him into signing the Loan Documents and 2014 Mwangi Guaranty. (Mwangi's Opp'n.) On January 26, 2018, PNC re-filed its reply. (PNC's Reply.)

## III.    Standard of Review

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should occur "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient

7

disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. Moreover, the Court cannot weigh the evidence to enter a judgment, but simply must determine whether a genuine issue for trial exists. *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 249).

Once the moving party properly submits and supports a motion for summary judgment, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; instead, there must be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Indeed, summary judgment must be granted if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the non-moving party "must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of some 'metaphysical doubt' concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). A "genuine" issue

concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, allows a reasonable factfinder to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

## IV.    Discussion

### A.    PNC's Breach of Contract Claims

#### 1.    Choice of Law

Although not addressed by the parties, the Court must first consider the choice of law applicable in this case. Federal courts sitting in diversity apply the law of the forum state to resolve state law claims. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Virginia, the forum state, "looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). "Unusual circumstances exist where there is 'no reasonable basis' for the choice-of-law provision, or where a party agreed to the provision due to improper means such as fraud or misrepresentation." *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 466 n.2 (E.D. Va. 2016) (citing *Wellmore Coal Corp. v. Gates Learjet Corp.*, 475 F. Supp. 1140, 1144 & n.3 (W.D. Va. 1979)).

In their briefings, the parties neither acknowledge nor address the applicability of the various choice-of-law provisions in the Loan Documents, individual guaranties or other agreements signed by Defendants. Nevertheless, the Court finds those provisions valid and enforceable for the reasons stated below.

The following contracts between the parties designate Pennsylvania law — excluding Pennsylvania's conflict of laws rules — as the law governing the interpretation of the contract:

9

the 2009 Brun Guaranty; the Visa Commercial Card Agreement; the 2014 Brun Consent of

Guarantor[3]; and, the Commercial Loan Agreement.  (2009 Brun Guaranty § 19; Visa

Commercial Card Agreement § 29; 2014 Brun Consent of Guarantor; Commercial Loan

Agreement § 10.11.)  And, the fact that PNC's principal place of business sits in Pittsburgh,

Pennsylvania constitutes a "reasonable basis" for the selection of Pennsylvania law.  (Am.

Compl. ¶ 1.)  *See Run Them Sweet, LLC*, 224 F. Supp. 3d at 466 n.2 (validating choice-of-law

provision designating Virginia law as controlling, because defendants' American headquarters

were located in Virginia).

 In contrast, the 2014 Brun Guaranty, Line of Credit Note and the Term Note designate

Virginia law — excluding Virginia's conflict of laws rules — as the law governing the

interpretation of those notes.  (2014 Brun Guaranty § 21; Line of Credit Note § 14; Term Note

§ 13.)  These choice-of-law provisions likewise provide a reasonable basis for the selection of

Virginia Law, because two out of the three defendants (Dominion and Mwangi) are residents of

Virginia.[4]  (Am. Compl. ¶¶ 2-3.)

 Finally, the 2014 Mwangi Guaranty designates Georgia law — excluding Georgia's

conflict of laws rules — as the law governing the interpretation of the contract.  (2014 Mwangi

Guaranty § 21.)  Because the PNC branch office that issued the 2014 Mwangi Guaranty sits in

---

[3] The 2014 Brun Consent of Guarantor lacks a choice-of-law provision, but provides that Brun consents to the provisions of the Visa Commercial Card Agreement.  (2014 Brun Consent of Guarantor.)  Accordingly, Pennsylvania law also governs the 2014 Brun Consent of Guarantor in accordance with the Visa Commercial Card Agreement.  (Visa Commercial Card Agreement § 29.)

[4] The 2014 Brun Guaranty lists Fredericksburg, Virginia as the location of the PNC branch office that issued the guaranty.  (2014 Brun Guaranty at 1.)  This provides an additional reasonable basis for the selection of Virginia law under the 2014 Brun Guaranty.

Atlanta, Georgia, the Court finds that this choice-of-law provision contains a reasonable basis for the selection of Georgia law. (2014 Mwangi Guaranty at 1.)

Mwangi's general allegations that PNC's loan officers fraudulently induced him to sign the loan documents by misrepresenting Mwangi's personal liability do not invalidate the choice-of-law provisions contained in the contracts. *See Zaklit v. Glob. Linguist Sols., LLC*, 2014 WL 3109804, at *7 (E.D. Va. July 8, 2014) (under Virginia law, a party resisting "operation of a choice-of-law provision on the basis of overreaching or fraud . . . must establish by clear and convincing evidence that the clause itself, as opposed to the contract as a whole, was the product of impropriety"). Here, neither Mwangi nor the other defendants have alleged fraud with respect to any of the choice-of-law provisions in the contracts. Thus, the clauses are valid and enforceable.

Finally, the SBA Loan Documents do not contain choice-of-law provisions.[5] "Under Virginia choice of law, the law of the place of performance governs questions concerning performance of a contract." *Sneed v. Am. Bank Stationary Co., Div. of ABS Corp.*, 764 F. Supp. 65, 66 (W.D. Va. 1991) (citing *Equitable Trust Co. v. Bratwursthaus Mgmt. Corp.*, 514 F.2d 565, 567 (4th Cir.1975) (additional citations omitted); *XL Specialty Ins. Co. v. Truland*, 2014 WL 4230388, at *2 (E.D. Va. Aug. 21, 2014) (following *Sneed*); *see also Arkla Lumber and Mfg. Co. v. West Virginia Timber Co.*, 146 Va. 641, 648 (1926) ("everything relating to the *performance* of the contract is to be controlled by the law of the place of performance") (emphasis in original) (internal quotations and citations omitted). Defendants' breach of the Loan Documents constitutes a performance issue. *XL Specialty Ins. Co.*, 2014 WL 4230388, at

---

[5]    Section 7 of the SBA Note does provide that, "When SBA is the holder, this Note will be interpreted and enforced under federal law[.]" (SBA Note § 7.) Although the SBA is not a party to this lawsuit, federal law still applies in the absence of some other choice-of-law provision.

*2. "The place of the payment on a contract is determinative of the place of performance of the contract." *FEI Co. v. Cambridge Glob. Servs., Inc.*, 2010 WL 3009311, at *4 (E.D. Va. July 7, 2010), *report and recommendation adopted*, 2010 WL 3009312 (E.D. Va. July 26, 2010) (applying Oregon law to contract where one party had to make payments to a company with its principal place of business in Oregon). Here, Pennsylvania law applies, because the SBA Loan Documents required Defendants to make payments to PNC, whose principal place of business lies in Pennsylvania. (Am. Compl. ¶ 1; SBA Loan Agreement; SBA Note.)

PNC argues that Defendants breached the SBA Loan Documents, Line of Credit Note and Term Note, which are governed by Virginia law, as well as the Visa Commercial Card Agreement and Commercial Loan Agreement, which are governed by Pennsylvania law. Accordingly, the Court will analyze Defendants breach of the Loan Documents in accordance with the laws of Virginia and Pennsylvania.[6]

### 2. Defendants' Breach of the Loan Documents

The elements for a breach of contract claim are virtually the same under Virginia and Pennsylvania law. In Virginia, a plaintiff must show "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004). Pennsylvania law similarly requires a showing of "(1) the existence of a contract, including its material terms; (2) breach of a duty imposed by the contract; and (3) resultant damages." *Gladstone Tech., Partners, LLC v. Dahl*, 222 F. Supp. 3d 432, 440 (E.D. Pa. 2016).

---

[6] Although Georgia law governs the 2014 Mwangi Guaranty, PNC does not assert that Mwangi or any other defendant breached the 2014 Mwangi Guaranty. Thus, Georgia's laws on breach of contract have no effect on the Court's analysis here.

In sum, PNC must establish the existence of their enforceable contracts with Defendants, Defendants' breach of those contracts and the resulting damages that PNC suffered.

First, the Court finds that Loan Documents are valid, legally enforceable contracts. Neither Brun nor Dominion contests the validity of any of the agreements. Mwangi alleges the contracts that he signed (the Loan Documents and 2014 Mwangi Guaranty) are void or subject to rescission, because PNC fraudulently induced his assent and signatures. (Mwangi's Opp'n at 2-4.) For the reasons detailed in the subsequent section of this opinion, the Court rejects Mwangi's arguments. Accordingly, no genuine issue of material fact exists affecting the validity of the Loan Documents or the guaranties executed by Brun and Mwangi.

Second, the evidence of Defendants' default stands beyond dispute. The first event of default — Defendants' failure to timely make payments on the Visa Commercial Card Agreement — constituted an event of default under the Visa Commercial Card Agreement, the SBA Note, the Line of Credit Note and the Term Note. (SBA Note § 4(A); Visa Commercial Card Agreement § 13(a); Line of Credit Note § 9(ii); Term Note § 8(ii).) The second event of default — Defendants' default on their lease and eviction from their business office — constituted an event of default under different provisions of the same documents. (SBA Note § 4(K); Visa Commercial Card Agreement § 13(k); Line of Credit Note § 9(viii); Term Note § 8(viii).) Each event of default separately triggered PNC's right to accelerate the loans and demand repayment.

In their initial response to PNC's Motion for Summary Judgment, Defendants objected to the consideration of the billing statements submitted by PNC as evidence of Defendants' late payments on the Visa Commercial Card Agreement, because PNC failed to provide the billing statements to Defendants before the discovery cut-off. (Defs.' Resp. at 1.); Fed. R. Civ. P.

56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Defendants also objected to consideration of the billing statements, Defendants' lease default and eviction from their business office on the grounds that the affidavit of Stephen Barr, Vice President and Asset Manager with the Asset Resolution Team for PNC, did not make clear that Barr possessed independent personal knowledge of Defendants' late payments. (Defs.' Resp. at 1-2; Barr Aff. ¶¶ 2-3.) Rather, the Barr Affidavit provided that Barr had "personal knowledge *of the business records of PNC Bank*[.]" (Barr Aff. ¶ 3 (emphasis added).)

The Court cured these objections when it re-opened discovery, so that parties could take additional discovery of the billing statements and other evidence of Defendants' default. (January 2018 Order.) Only Mwangi elected to re-file a response, but he did not further object to the Court's consideration of the billing statements, Defendants' lease default or the eviction. (Mwangi's Opp'n.) PNC submitted a supplemental affidavit by Barr when it re-filed its reply, in which Barr clarified that "[i]n addition to [his] personal knowledge of the business records of PNC . . . , [he] also ha[s] independent personal knowledge regarding the facts and circumstances surrounding Defendants' default[.]" (Suppl. Barr Aff. ¶ 6.) Barr stated that Snydor contacted him several times to inform him that Dominion had fallen behind on its rent payments in July, August and September 2016. (Suppl. Barr. Aff. ¶¶ 16-18.) In further support of Barr's independent personal knowledge, PNC submitted emails between Snydor, Barr and Mwangi, discussing Dominion's delinquent rent payments, and a demand letter for payment of past due rent from Snydor to Dominion, copying Barr. (Landlord Emails; Barr Email; Notice of Lease Default.)

Given the supporting evidence submitted by PNC, and Defendants' lack of valid objection to that evidence, no genuine issue of material fact exists that Defendants defaulted on their obligations under the Loan Documents.

Finally, the parties do not dispute that PNC has suffered monetary damages as a result of Defendants' breach of the Loan Documents. (Am. Compl. at ¶¶ 33, 63, 89, 113.) Aside from the now moot issue of the admissibility of the evidence of Defendants' default, neither Brun nor Dominion asserted any defense to PNC's breach of contract claims. Because Mwangi's fraud defense also fails, the Court finds no genuine issue of material fact that would allow a factfinder to find in favor of Defendants on PNC's four counts of breach of contract.

### B.     Mwangi's Fraud Defense

Mwangi alleges that PNC's loan officers pressured him into signing the Loan Documents and 2014 Mwangi Guaranty, did not give him adequate time to review the contracts and made misrepresentations to him about his personal liability under the contracts. (Mwangi's Opp'n at 1-2.) Specifically, Mwangi asserts that PNC loan officers Bruce Marks — who coordinated the SBA Loan — and Stephen Kingsley ("Kingsley") — who coordinated the other three loans — told Mwangi in person, and by phone, that PNC neither required a personal guaranty of the loans nor would PNC hold Mwangi personally liable for any Dominion debts. (Decl. of Gerald Mwangi ("Mwangi Decl.") (ECF No. 35-1) ¶¶ 4-7.) Mwangi further asserts that, as an immigrant from Kenya, English does not serve as his first language. (Mwangi Decl. ¶ 2.) Accordingly, Mwangi argues that the Court cannot hold him personally liable for Defendants' default on the four commercial loans, because PNC garnered his assent and signatures on the Loan Documents and 2014 Mwangi Guaranty by committing fraud in the factum or, alternatively, fraud in the inducement. (Mwangi's Opp'n at 2-4.)

To support his fraud defenses, Mwangi points to a July 18, 2016 email from Kingsley to attorney Andrew Miller (the "2016 Kingsley Email"). (Mwangi Decl., Ex. A ("2016 Kingsley Email").) Kingsley wrote to Miller, copying Mwangi, regarding the possibility of releasing Mwangi's personal assets as security for the SBA Note. (2016 Kingsley Email at 1.) Kingsley stated:

> Since . . . Mwangi is not a guarantor on the SBA loan, I am going to request that his personal UCC filing be released. I don't think it is necessary, nor am I sure if [Mwangi] should have been listed on the original Security Agreement. I wasn't the banker that closed the loan, so it is hard to determine the original intent.

(2016 Kingsley Email at 1.) Although Kingsley made this statement over two years after Mwangi reviewed and signed the Loan Documents, Mwangi argues that Kingsley's misinterpretation of Mwangi's personal liability in 2016, "makes it perfectly believable that the loan officers misunderstood and misrepresented the loan documents to . . . Mwangi at the time the loan papers were generated and signed . . . ." (Mwangi's Opp'n at 3.)

PNC argues that no facts exist to support Mwangi's claims of fraud in the factum. (PNC's Reply at 8-11.) Even if Mwangi's allegations are true, PNC argues that Mwangi also cannot claim fraud in the inducement, because Mwangi independently reviewed and signed the Loan Documents, rendering his reliance on the PNC loan officers' statements unjustifiable. (PNC's Reply at 11-13.) Further, PNC asserts that the 2016 Kingsley Email does not constitute an admission by PNC that Mwangi does not have personal liability for Defendants' default. (PNC's Reply at 15-16.)

### 1.    Choice of Law

In accordance with *Klaxon*, the Court applies the law of the forum state, Virginia, to determine the merit of Mwangi's fraud claims. 313 U.S. at 496-97. Virginia applies "the law of the place of the wrong" choice of law theory to tort actions. *Milton v. IIT Research Institute*, 138

F.3d 519, 521 (4th Cir. 1998); *Aggarwal v. Sikka*, 2013 WL 12089510, at *3 n.3 (E.D. Va. Feb. 22, 2013). In this case, the alleged wrong — PNC's fraud — occurred in Virginia, where Defendant Mwangi resides and operates his business. Thus, the Court will apply Virginia law to determine whether PNC's fraud constitutes grounds for rescission of the SBA Loan Documents, which do not contain applicable choice-of-law provisions. (SBA Loan Agreement; SBA Note.) However, Virginia law does not control the entirety of the Court's analysis here. The parties have again ignored the applicability of the valid and enforceable choice-of-law provisions included in the contracts signed by Mwangi.

The Fourth Circuit has explained that "[w]here a choice of law clause in [a] contract is sufficiently broad to encompass contract-related tort claims such as fraudulent inducement, other courts have honored the intent of the parties to choose the applicable law." *Hitachi*, 166 F.3d at 628 (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 178 (3d Cir. 1992) (applying Pennsylvania law to fraudulent inducement claim, because contract provided that "it is to be governed by, and construed in accordance with, the laws of . . . Pennsylvania")); *Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1139 (6th Cir. 1991) (finding that choice-of-law clause in contract covered fraudulent inducement claim)). In *Hitachi*, the applicable choice-of-law clause provided for application of Virginia law "in the interpretation of '[t]his Agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance.'" *Id.* at 624. The Fourth Circuit found this language sufficiently broad to encompass the plaintiff's fraudulent inducement claim. *Id.* at 628. Use of less sweeping language in a choice-of-law provision may still cover contract-related tort claims. *See, e.g., Run Them Sweet, LLC*, 224 F. Supp. 3d at 468 n.7 ([N]othing in *Hitachi* indicates that a choice-of-law provision must use that exact language for the contractually-selected law to apply to

contract-related tort claims."). For example, in *Run them Sweet*, the court found a choice-of-law clause stating that the agreement "shall be 'governed and construed in accordance with' Virginia law" sufficiently broad to cover contract-related torts claims. *Id.* at 466.

Here, the Court likewise finds the following language broad enough to encompass Mwangi's contract-related fraud claims: First, the Visa Commercial Card Agreement provides, "this agreement and all questions relating to the subject matter hereof shall be governed by and construed in accordance with the laws of . . . Pennsylvania." (Visa Commercial Card Agreement § 29.) This language echoes the language used in *Run them Sweet*. 224 F. Supp. 3d at 466. Second, the Commercial Loan Agreement provides that the agreement will be "interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of [Pennsylvania.]" (Commercial Loan Agreement § 10.11.) Third, the 2014 Mwangi Guaranty uses the same governing law language as the Commercial Loan Agreement, but with respect to Georgia law. (2014 Mwangi Guaranty § 21.) Finally, the Line of Credit Note and the Term Note likewise provide that those agreements "will be interpreted and the rights and liabilities" of the parties determined in accordance with the laws of Virginia. (Line of Credit Note § 14; Term Note § 13.) Because the language referring to the "rights and liabilities" of the parties in the 2014 Mwangi Guaranty, Commercial Loan Agreement, Line of Credit Note and Term Note mirrors the language referring to the "rights and obligations of the parties" in *Hitachi*, the Court likewise finds those choice-of-law provisions broad enough to cover Mwangi's fraud claims. 166 F.3d at 624.

Accordingly, the Court will apply Virginia law to determine whether Mwangi can establish PNC's fraud and has grounds for rescission of the Line of Credit Note, Term Note or SBA Loan Documents. The Court will apply Pennsylvania law to determine whether Mwangi

has grounds to void the Visa Commercial Card Agreement or Commercial Loan Agreement. Lastly, the Court will apply Georgia law to determine whether Mwangi has grounds to rescind the 2014 Mwangi Guaranty.[7]

### 2. Mwangi cannot establish that PNC induced his assent and signatures by fraud in the factum or fraud in the inducement.

#### a. Fraud in the Factum

Mwangi alleges that PNC cannot bind him by the Loan Documents or 2014 Mwangi Guaranty, "because his signatures and assent were induced by fraud in the factum." (Mwangi's Opp'n at 2.) PNC responds that Mwangi cannot establish the facts and circumstances necessary to prove fraud in the factum. (PNC's Reply at 8-11.) The Court agrees with PNC.

Under Virginia law, which governs the SBA Loan Documents, Line of Credit Note and Term Note, "fraud in the factum is synonymous with fraud in the execution." *Givens v. Citibank, N.A.*, 2010 WL 2306412, at *4 (E.D. Va. June 3, 2010) (quoting *Lucas v. Thompson*, 2003 WL 483831, at *3 (Va. Cir. Ct. 2007)). Fraud in the execution of an instrument may occur where the party perpetrating the fraud misreads the instrument to the innocent party, alters the document without the innocent party's knowledge or obtains the innocent party's signature on a different document than the innocent party believed to be signing. *Sager v. W. T. Rawleigh Co.*, 153 Va. 514, 526-27 (1929); *Hayes v. Virginia Mut. Protection Ass'n*, 76 Va. 225, 230 (1882). Typical

---

[7]     Even if the choice-of-law provisions in the contracts were inapplicable, the Court would apply the "place of the wrong principle" to determine which state's law applies to Mwangi's fraud claims. In that scenario, Virginia law would control the Court's analysis. The Court reaches the same result — that Mwangi cannot establish PNC's fraud — under Virginia, Pennsylvania and Georgia law, so application of the choice-of-law provisions versus the "place of the wrong" principle does not affect the outcome of this case. *See, e.g., MainStreet Bank v. Nat'l Excavating Corp.*, 791 F. Supp. 2d 520, 529-30 (E.D. Va. 2011) (noting that the court reaches the same result whether it applies a Virginia choice-of-law clause or the *lex loci delicti* (the "place of the wrong") principle).

indicators of fraud in the factum include weakness of mind and serious disabling illness. *Lucas*, 2003 WL 483831, at *3; *see, e.g., Ferguson v. Ferguson*, 169 Va. 77, 89 (1937) (listing extreme old age as an additional badge of fraud).

Similarly, under Pennsylvania law, which governs the Visa Commercial Card Agreement and Commercial Loan Agreement, and under Georgia law, which controls the 2014 Mwangi Guaranty, fraud in the factum equates to fraud in the execution. *Bellamy v. Resolution Tr. Corp.*, 266 Ga. 630, 631 (1996) (fraud in the factum constitutes "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents . . . .") (additional quotation omitted); *Germantown Mfg. Co. v. Rawlinson*, 341 Pa. Super. 42, 50 (1985) ("A typical example of [fraud in the factum] involves a surreptitious substitution of one document for another and the innocent party signing it without knowledge or a reasonable opportunity to know the character or essential terms of the substituted document."). A showing of fraud in the factum renders a contract void. *Bank of the Ozarks v. Khan*, 903 F. Supp. 2d 1370, 1378 (N.D. Ga. 2012); *In re Spence*, 1999 WL 35108963, at *6 (Bankr. E.D. Va. May 24, 1999); *Germantown Mfg. Co.*, 341 Pa. Super. at 50.

To prevail on a claim of fraud in the factum, Mwangi must show that he did not understand the true nature or contents of the agreements that he signed. *Giannone v. Ayne Inst.*, 290 F. Supp. 2d 553, 562 (E.D. Pa. 2003); *see also In re Spence*, 1999 WL 35108963, at *6 (finding no fraud in the factum where party claiming fraud fully understood the document signed and its essential terms); *Straus v. Renasant Bank*, 326 Ga. App. 271, 275 (2014) (same). In this case, Mwangi points to no evidence of forgery, alteration of terms, omitted terms or a misreading of the agreements — typical indicators of fraud in the factum. Nor has Mwangi shown that, due to serious weakness of mind or disabling illness, the PNC loan officers overbore his will and

induced his signature. Instead, Mwangi merely asserts that he immigrated to the United States from Kenya and does not hold English as his first language, but he never claims that he could not read or understand English. (Mwangi's Opp'n at 1-3; Mwangi Decl. ¶ 2.) Indeed, Mwangi's email communications with Kingsley demonstrate his ability to communicate in English. (PNC's Reply, Ex. B ("Mwangi-Kingsley Emails").)

Rather, Mwangi asserts that he relied on the PNC loan officers' oral misrepresentations about his personal liability, which ran contrary to the express terms of the agreements that Mwangi signed. (Mwangi's Opp'n at 2-3.) Courts find this type of claim more appropriately characterized as fraud in the inducement — not fraud in the factum. *See Giannone*, 290 F. Supp. 2d at 561 ("Courts 'classically' distinguish between . . . fraud in the factum and fraud in the inducement."). In *Giannone*, the court explained that, in contrast to fraud in the factum, "[f]raud in the inducement . . . does not involve terms omitted from an agreement, but rather allegations of oral representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement." 290 F. Supp. 2d at 562 (quoting *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1300 (3d Cir.1996)); *see also Bank of the Ozarks*, 903 F. Supp. 2d at 1378 ("If a party understands the nature of the contract they are executing but contends that there has been some material misrepresentation as to the obligations rising thereunder, only a fraud in the inducement claim will lie.") (quoting *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 995 (11th Cir. 2012)); *In re Spence*, 1999 WL 35108963, at *6 (while debtors could not establish fraud in the factum, the court noted that they may have a fraud in the inducement claim based on their reliance on bank's statements regarding debtors' ability to refinance).

Because Mwangi cannot establish a lack of understanding of the true nature and contents of the Loan Documents or 2014 Mwangi Guaranty, he has no grounds to void the agreements based on fraud in the factum.

### b. Fraud in the Inducement

Alternatively, Mwangi alleges that PNC fraudulently induced him to sign the Loan Documents by pressuring him to sign quickly and misrepresenting to him that he would not be personally liable for any of the loans. (Mwangi's Opp'n at 3.) PNC asserts that Mwangi unjustifiably relied on the PNC loan officers' alleged statements; thus, Mwangi cannot establish his *prima facie* case for fraud in the inducement. (PNC's Reply at 11-13.) Assuming, without deciding, that Mwangi has presented evidence sufficient to prove all other elements of a fraudulent inducement claim, the Court finds that Mwangi's defense ultimately fails, because he cannot establish the essential element of reliance.

### i. Rescission of the Line of Credit Note, Term Note and SBA Loan Documents

Virginia law governs Mwangi's claim that the PNC loan officers fraudulently induced him into signing the SBA Loan Documents, Line of Credit Note and Term Note. Under Virginia law, "a false representation of a material fact, constituting an inducement to [a] contract, on which the [defrauded party] had a right to rely, is always ground[s] for rescission of the contract." *Persaud Companies, Inc. v. IBCS Grp.*, Inc., 425 F. App'x 223, 226 (4th Cir. 2011) (quoting *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 111-12 (1979)). To prevail on a claim for fraud in the inducement, Mwangi must establish by clear and convincing evidence that PNC made misrepresentations, "which were positive statements of fact, made for the purpose of procuring the contract; that they [are] untrue; that they are material; and that the party to whom they were made relied upon them, and was induced by them to enter into

22

the contract." *Brame v. Guarantee Finance Co., Inc.*, 139 Va. 394 (1924); *see also Benton v. Phillips Edison & Co., Ltd.*, 2017 WL 6273361, at *5 (E.D. Va. Dec. 8, 2017) (citing *Brame*); *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 452 (E.D. Va. 2009) (same); *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994) (requiring clear and convincing evidence to establish a case of actual fraud).

Reliance on a material misrepresentation of fact must be reasonable and justified. *Hitachi*, 166 F.3d at 629. Justifiable reliance and reasonable reliance are not mutually exclusive — reasonable reliance poses a higher standard. *White v. Potocska*, 589 F. Supp. 2d 631, 650 n.18 (E.D. Va. 2008) ("While the majority of states require only justifiable reliance, . . . Virginia is one of the minority of states that requires the higher standard of reasonable reliance to establish fraud."). Prudent investigation serves as "the touchstone of reasonableness." *Hitachi*, 166 F.3d at 629. "A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry." *Id.* (citing *Harris v. Dunham*, 203 Va. 760 (1962)).

Examples of unreasonable reliance include "where a party had information that would excite the suspicions of a reasonably prudent person" or "where one relies upon an oral statement that is contrary to a written statement in his possession." *Elliott v. Great Point Partners, LLC*, 2011 WL 63657, at *5 (E.D. Va. Jan. 5, 2011) (listing "settled instance[s]" of unreasonable reliance). The facts of *Foremost Guaranty Corporation v. Meritor Savings Bank*, 910 F.2d 118, 126 (4th Cir. 1990), illustrate the latter example from *Elliott*. Applying Virginia law, the Fourth Circuit held that the plaintiff insurers could not show that they reasonably relied on representations from the defendant mortgage company, because the mortgage company provided

the insurers with memorandum that contradicted the mortgage company's statements. *Foremost Guar. Corp.*, 910 F.2d at 126. "[W]hen the contradictions came to light, the insurers gambled financially by not confirming [the mortgage company's] representations." *Id.* at 125. Thus, the insurers could not establish fraud. *Id.* at 126.

However, "the cases are clear that, in Virginia, one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth." *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 631 (1985) (hereinafter, "*Nationwide*"); *see also Carlucci v. Han*, 907 F. Supp. 2d 709, 741 (E.D. Va. 2012) (citing *Nationwide*). In *Nationwide*, the policyholder alleged that an insurance agent made misrepresentations about language in the policy and fraudulently induced him into purchasing the policy. *Id.* at 628-29. The trial court found for the policyholder on the constructive fraud claim. *Id.* at 629. On appeal, Nationwide argued that the policyholder failed to establish his reliance on the agent's statements, because the policyholder "had available . . . means of acquiring the correct information about the meaning of the policy." *Id.* at 630-31. Affirming the decision of the trial court, the Supreme Court of Virginia rejected Nationwide's argument and highlighted the fact that the written materials provided to the policyholder directed him to speak to the very agent who made the misrepresentations. *Id.* When the policyholder followed those instructions, the agent provided him with inaccurate information. *Id.*

Here, PNC argues that Mwangi cannot establish that he justifiably and reasonably relied on the alleged misrepresentations of the PNC loan officers, because Mwangi independently

reviewed the agreements before signing. (PNC's Reply at 11-12.) Relying on *Nationwide*,[8] Mwangi argues that PNC cannot claim that he "was negligent or unreasonable in failing to learn the truth" when the PNC loan officers induced Mwangi to enter the agreements "through deception or misrepresentations." (Mwangi's Opp'n at 3.) The Court finds Mwangi's argument unpersuasive. Unlike the materials instructing the policyholder in *Nationwide* to direct questions to the same agent that made the misrepresentations about the policy, the agreements signed by Mwangi contain no such instruction. 229 Va. at 630-31. Thus, review of the agreements would have revealed any misrepresentation by the PNC loan officers misrepresentations (if any occurred).

Also, unlike the policyholder in *Nationwide*, whom the court described as "a layman" with presumably less access to information about the policy than the insurance agent, PNC describes Mwangi as a "savvy business man," who participated in negotiating the terms of some of the loans. (PNC's Reply at 12-13, 16; Mwangi-Kingsley Emails at 6-9.)[9]; 229 Va. at 631.

---

[8]     Mwangi also relies on *Carlucci* to establish his justifiable and reasonable reliance. (Mwangi's Opp'n at 3-4.) In *Carlucci*, the court held that the plaintiff investor's fraud claims survived the defendant company's motion to dismiss. 907 F. Supp. 2d at 741-42. But, at the motion to dismiss stage, the *Carlucci* court did not have all the evidence necessary to analyze the reliance element of the fraud claims. *Id.* at 741-42. The court emphasized that "reliance is a fact-intensive inquiry that is usually inappropriate for a motion to dismiss." *Id.* To the extent that the court did discuss reliance, it rejected the defendant's argument that the plaintiff had access to the information needed to disprove the defendant's alleged misrepresentations. *Id.* at 738. The court explained that, "[a]t best, the issue of whether [the plaintiff] had access to the relevant information is in dispute[,]" and, "it is not clear that reasonable inquiry would have yielded the relevant information as to the remaining alleged misrepresentations." *Id.* at 738. In contrast, Mwangi clearly had access to, reviewed and signed the Loan Documents and the 2014 Mwangi Guaranty. (Mwangi-Kingsley Emails.) Also, unlike in *Carlucci*, Mwangi's review of the Loan Documents and 2014 Mwangi Guaranty would have negated the PNC's loan officers' alleged misrepresentations about Mwangi's personal liability. 907 F. Supp. 2d at 738.

[9]     As Exhibit C of its Reply, PNC presents a complaint, and its incorporated attachments, filed by SunTrust Bank against Dominion, as a guarantor for Hamelin Mechanical Services, Inc. ("Hamelin"), in state court in North Carolina. (PNC's Reply at 17, Ex. C ("SunTrust

Indeed, in 2014, Mwangi emailed Kingsley "2014 Projections," including financial statements and tax returns, and he inquired "[h]ow soon can we get to underwriting?" (Mwangi-Kingsley Emails at 7-9.) Mwangi also emailed Kingsley about executing the Visa Commercial Card Agreement, writing, "Has the application been mailed out yet for the credit card. We have not received it. I was hoping to execute that this week before I leave on Friday for a one week trip." (Mwangi-Kingsley Emails at 2-3.) Although Mwangi hails from Kenya and does not regard English as his first language, PNC correctly notes that Mwangi never claims that he could *not read and understand the loan documents.* (PNC's Reply at 16.) These communications show Mwangi's ability to communicate with the PNC loan officers, and they contradict Mwangi's assertions that the PNC loan officers pressured him into hastily signing any of the agreements.[10]

---

Complaint").) As Exhibit D of its Reply, PNC puts forth a complaint and judgment issued by a state court in Pennsylvania, in favor of Aegis Security Insurance Company ("Aegis") against Hamelin, Mwangi and Brun. (PNC's Reply at 17, Ex. D ("Aegis Complaint").) PNC offers this evidence not for "the truth of the matter asserted therein, but as evidence of . . . Mwangi's sophistication with the English language and with the world of business." (PNC's Reply at 17.) For example, Mwangi has served as both Vice President and President of Hamelin, a business operating primarily out of North Carolina. (SunTrust Complaint at 1, 9; Aegis Complaint at 22.) In 2016, Mwangi executed a Corporate Liability Commercial Card Agreement with SunTrust Bank in his capacity as Vice President of Hamelin, whereby SunTrust extended over $300,000 in credit to Hamelin. (SunTrust Complaint at 2, 9.) Also in 2016, Mwangi, individually and in his capacity as President of Hamelin, executed an Agreement of Indemnity ("AOI") with Aegis. (Aegis Complaint at 1-8, 15-24.) Under the AOI, Aegis agreed to issue payment bonds to Hamelin to use in its construction business. (Aegis Complaint at 8, 15-24.)

[10]     The Court also agrees with PNC that the 2016 Kingsley Email does not constitute an admission by PNC that Mwangi possesses no personal liability for the SBA Loan or any of the other loans. (PNC's Reply at 15; 2016 Kingsley Email.) In the email, Kingsley wrote, "Since . . . Mwangi is not a guarantor on the SBA loan, I am going to request that his personal UCC filing be released." (2016 Kingsley Email at 1.) Kingsley correctly stated that Mwangi does not serve as a guarantor on the SBA Loan. Rather, Mwangi signed the SBA Note individually as a co-borrower, and on behalf of Dominion. (SBA Note at 6; PNC's Reply at 15.) Kingsley further clarifies in the email that he "wasn't the banker that closed the [SBA] [L]oan." (2016 Kingsley Email at 1.) The email from 2016 does not establish that — years before — the PNC loan officers misrepresented Mwangi's personal liability when he signed the Loan Documents and the 2014 Mwangi Guaranty. Even if the loan officers did make the alleged misrepresentations,

In *Harris v. Dunham*, an "experienced business man," Dunham, claimed that the defendant sellers fraudulently induced him to buy Dairy Queen stock. 203 Va. 760, 761-63, 767 (1962). The sellers failed to tell Dunham, among other misrepresentations, that several Dairy Queen stores would not re-open that year. *Id.* at 766-67. Had Dunham reviewed the corporate books and records more closely, he would have discovered that, "the business was in a precarious condition [and] that the value of its stock was questionable." *Id.* at 766-69. Thus, the Supreme Court of Virginia rejected Dunham's fraudulent inducement claim, holding:

> [A]lthough [Dunham] examined the corporate books . . . and reports, he did not explore the situation presented thereby . . . and make an inspection of the stores. He is, nonetheless, by virtue of the fact that he investigated partially, bound by all that a complete investigation would have disclosed.

*Id.* at 768. The court emphasized Dunham's twenty-nine years of business experience, which included nine years of managing a department store that "[did] more than [$1.5 million in] annual business." *Id.* at 767. Despite Dunham's robust experience, the court noted, "[w]hat Dunham was shown, and given full opportunity to examine, would have disclosed [the stores' troubles] even to one not as experienced as he[.]" *Id.* at 768. Mwangi's business experience may not rise to the level of Dunham's experience in *Harris*; however, compared to the layperson in *Nationwide*, Mwangi's communications with Kingsley and his role as President of PNC prepared and situated him to understand the contents of the contracts. *Id.* at 767-68; *Nationwide*, 229 Va. at 631.

Regardless of Mwangi's business savvy, he cannot overcome the fact that he had the agreements before signing and the ability to read the provisions negating the PNC loan officers' alleged misrepresentations. In *Persaud Companies, Inc. v. IBCS Group, Inc.*, the district court,

---

Mwangi still cannot show that he justifiably and reasonably relied on their statements, as explained above.

citing *Nationwide*, held that the defendant bond company could not use the plaintiff construction company's negligence "as an excuse where [the defendant's] misrepresentations diverted [the plaintiff] from discovering that it would not receive a refund" for a bond premium. 2010 WL 1404390, at *1-6 (E.D. Va. Apr. 5, 2010), *vacated*, 425 F. App'x 223 (4th Cir. 2011). The court took issue with the fact that the defendant knew, "as the drafting party, that while the marketing brochure stated a full refund of the bond premium would be available, no such refund was due under the . . . terms" of the parties' agreement. *Id.* at *6. The court described the defendant's conduct as more than simple concealment. *Id.* (noting that that the defendant's representative directed the plaintiff's agent to the marketing brochure "every time [he] raised a question about [the] refund policy"). Because the defendant's representative "actively misdirected" the plaintiff's agent, the court granted summary judgment in favor of the plaintiff for its fraud claim, despite the plaintiff's failure to discover the inconsistencies between the parties' agreement and the defendant's misrepresentations. *Id.* at *6-10.

On appeal, the Fourth Circuit reversed the district court's decision. *Persaud Cos., Inc.*, 425 F. App'x at 226. The court held: "Given the unequivocal contract language, Persaud's reliance on the statements in the brochure was unreasonable." *Id.* Citing the Supreme Court of Virginia, the court explained:

> Where ordinary care and prudence are sufficient for full protection, it is the duty
> of the party to make use of them. Therefore, if false representations are made
> regarding matters of fact, and the means of knowledge are at hand and equally
> available to both parties, and the party, instead of resorting to them, sees fit to
> trust himself in the hands of one whose interest is to mislead him, the law, in
> general, will leave him where he has been placed by his own imprudent
> confidence.

*Id.* (quoting *Costello v. Larsen*, 182 Va. 567, 571-72 (1944) (internal quotation marks omitted));
*see also Johnson v. Washington*, 559 F.3d 238, 245 (4th Cir.2009) (affirming summary judgment

in favor of the defendant, because "[e]ven assuming that [the defendant] . . . misled the [plaintiffs], . . . the documents that [the plaintiffs] signed plainly stated the terms of the transaction and more than corrected any misleading oral statements"); *Horner v. Ahem*, 207 Va. 860, 863-64 (1976) (following *Costello*).

Similarly here, the unequivocal contract language of the Loan Documents and 2014 Mwangi Guaranty makes Mwangi's personal liability clear. Page 1 of the SBA Note designates Mwangi, Brun and Dominion jointly as "Borrower" and clearly sets forth the Borrower's repayment responsibilities. (SBA Note at 1.) Mwangi also signed the SBA Note in his individual capacity and in his capacity as President of Dominion. (SBA Note at 6.) The SBA Note also provides that "all individuals and entities signing this Note are jointly and severally liable." (SBA Note § 9(A).) Further, the 2014 Mwangi Guaranty clearly designates Mwangi as "Guarantor" and Dominion as "Borrower," and states, "the Guarantor hereby unconditionally guarantees, and becomes surety for . . . prompt payment and performance of the Obligations . . . [including] all loans, advances, debts . . . and duties ow[ed] by the Borrower to the Bank . . . of any kind or nature, *present or future*." (2014 Mwangi Guaranty § 1(a) (emphasis added).) Finally, the Commercial Loan Agreement clearly designates Mwangi, Brun and Dominion "jointly and severally" as "Borrower." (Commercial Loan Agreement at 1.) That agreement plainly sets forth the borrowers' repayment obligations in the event of default on the Commercial Loan Agreement, or in the event of default on the Line of Credit Note or Term Note, which Mwangi executed in his capacity as President of Dominion on December 12, 2014. (Commercial Loan Agreement § 6; Line of Credit Note at 1, 8; Term Note at 1, 7.) Consequently, even if the PNC loan officers actively misdirected Mwangi, the agreements that Mwangi signed

unequivocally establish his personal liability as a co-borrower and guarantor of Dominion's debts to PNC.

Ultimately, Mwangi cannot show that he justifiably and reasonably relied on the PNC loan officer's statements in accordance with Virginia law. Thus, Mwangi can neither establish the elements necessary for fraud in the inducement nor grounds for rescission of the SBA Loan Documents, Line of Credit Note or Term Note.

### ii. Rescission of the Visa Commercial Card Agreement and Commercial Loan Agreement

The elements for a claim of fraud in the inducement are the same under Virginia and Pennsylvania law, except for the element of reliance. *Compare Hitachi*, 166 F.3d at 628 (listing the elements for an actual fraud claim under Virginia law) *and Brame*, 139 Va. at 394 (listing elements for fraud in the inducement claim under Virginia law), *with Porreco v. Porreco*, 571 Pa. 61, 69-71 (2002) (listing elements for actual fraud under Pennsylvania law) *and Wilson v. Donegal Mut. Ins. Co.*, 410 Pa. Super. 31, 40-41 (1991) ("The essential elements of a cause of action for fraud or deceit are a misrepresentation, a fraudulent utterance thereof, an intention to induce action thereby, justifiable reliance thereon and damage as a proximate result"). Under Pennsylvania law, a party may void a contract due to a fraudulent misrepresentation, but "[a]ll of these elements must be present to warrant the extreme sanction of voiding [a] contract." *Porreco*, 571 Pa. at 69. While Virginia law requires justifiable *and* reasonable reliance, Pennsylvania law requires only justifiable reliance. *Field v. Mans*, 516 U.S. 59, 74 n. 12 (1995); *White*, 589 F. Supp. 2d at 650 n.18.

In *Field v. Mans*, the Supreme Court described justifiable reliance as an "intermediate level of reliance" situated between "mere reliance in fact" and the stricter standard of reasonable reliance. 516 U.S. at 73-75. The Court explained that a party "is justified in relying on a

30

representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at 70 (citing § 540 of the Restatement (Second) of Torts). For example, a buyer of land may rely on a seller's representation that the land stands free of encumbrances without visiting the office of the register of deeds in the courthouse across the street. *Id.* The Court also described justifiable reliance as the standard applied "where, under the circumstances, the facts should be apparent to one of [the victim's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id.* at 71-72 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)). In sum, justifiable reliance poses no duty to investigate, unless the victim of the fraud, based on his own capacity and knowledge, can recognize the misrepresentation or the probability that the party committing the fraud deceived him. *Id.* [11]

Although the Supreme Court, relying on a 1978 state survey, grouped Pennsylvania with the states following the intermediate justifiable reliance standard, later decisions from courts

---

[11] *Field* involved an adversary complaint initiated by creditors seeking to except debt from discharge based on the debtor's misrepresentations under Chapter 11 of the Bankruptcy Code. *Id.* at 61-63. The Court held that the standard for discharging debt under 11 U.S.C. § 523(a)(2)(A) for fraudulent representation required only justifiable reliance on the misrepresentations. *Id.* at 74-75. In *Husky International Electronics, Inc. v. Ritz,* the Supreme Court later explained that, "*Field* discussed . . . 'reliance' only in setting forth the requirements of the form of fraud alleged in that case—namely, fraud perpetrated through a misrepresentation to a creditor." 136 S. Ct. 1581, 1589-90 (2016) ("The Court was not establishing a 'reliance' requirement for frauds that are *not* premised on such a misrepresentation.") (emphasis added). Accordingly, this Court need not strictly apply the *Field* definition of justifiable reliance.

Even applying the lower justifiable reliance standard as articulated in *Field,* Mwangi still cannot be said to have justifiably relied on the PNC loan officer's alleged misrepresentations. Just a "cursory glance" at the first page of some of the Loan Documents, particularly the 2014 Mwangi Guaranty, would alert Mwangi to his personal liability for PNC's debt. (2014 Mwangi Guaranty at 1.) Under the Prosser definition of justifiable reliance, cited in *Field,* Mwangi's own capacity and knowledge — shaped by his experience as President of Dominion and his communications with Kingsley — triggered the duty to investigate, or at least read, the agreements. 516 U.S. at 71-72.

applying Pennsylvania law equate justifiable reliance with reasonable reliance. 516 U.S. at 74 n. 12. In *Porreco*, the Supreme Court of Pennsylvania explained that "[t]o be justifiable, reliance upon the representation of another must be reasonable." 571 Pa. at 69 (citing *In re Allegheny Int'l, Inc.*, 954 F.2d at 178 ("Of course, a party seeking to avoid a contract for misrepresentation must show that it reasonably relied on the misrepresentation in entering into the contract.")); *see also Standefer v. T. S. Dudley Land Co.*, 2010 WL 11534333, at *10-11 (M.D. Pa. July 14, 2010), *aff'd*, 433 F. App'x 85 (3d Cir. 2011) (following *Porreco*); *Taylor v. Creditel Corp.*, 2006 WL 166574, at *6 (E.D. Pa. Jan. 19, 2006) ("Justifiable reliance requires not only that the [p]laintiff relied on a representation made, but also that the reliance on the representation must be reasonable.").

Under Pennsylvania law, one may justifiably rely on the representations of a party believed to have superior information "[w]here the means of obtaining the information in question were not equal[.]" *Porreco*, 571 Pa. at 70 (citing *Siskin v. Cohen*, 363 Pa. 580, 584 (1950)). Conversely, courts may find reliance unjustifiable "where the party claiming reliance had an adequate opportunity to verify the allegedly fraudulent statements." *Id.*; *Standefer*, 2010 WL 11534333, at *10-11.

The wife in *Porreco* sought to have the couple's prenuptial agreement voided when she discovered that her husband had misrepresented that the wife's engagement ring did not contain a real diamond. 571 Pa. at 64-66. The court held that the wife could not establish that she justifiably relied on her husband's misrepresentation of the value of her ring, when the wife had possession of the ring at the time that the couple executed the agreement and failed to have it appraised. *Id.* at 71 ("We find [the wife's] failure to do this simple investigation to be unreasonable."). Similarly, in *Standefer*, the court granted summary judgment for the defendant

32

lessee, because the plaintiff lessors could not establish justifiable reliance on the defendant's pricing of the land. 2010 WL 11534333, at *11. The court held that the plaintiffs should have known that the defendant made false statements, because the attorney for one of the plaintiffs told her that other clients would offer more money and advised her not to sign the lease. *Id.* (noting that plaintiffs "cannot meet the requisite standard regarding the reasonableness of [their] reliance").

Like the wife in *Porreco* and the lessors in *Standefer*, Mwangi cannot establish justifiable reliance, because he had access to the Loan Documents and 2014 Mwangi Guaranty. Simply by reading the agreements, Mwangi had the opportunity to verify the alleged misrepresentations. Because Mwangi cannot prove by clear and convincing evidence that he justifiably relied on the PNC loan officers' alleged statements, he cannot establish fraud in the inducement under Pennsylvania law and has no grounds to void the Visa Commercial Card Agreement or the Commercial Loan Agreement.

### iii.    2014 Mwangi Guaranty

Under Georgia law, which controls the 2014 Mwangi Guaranty, the tort of fraudulent inducement "has five elements: a false representation by [the accused party], scienter, intention to induce the [accusing party] to act or refrain from acting, justifiable reliance by [that party], and damage [thereto]." *Stafford v. Gareleck*, 330 Ga. App. 757, 762 (2015). A party asserting fraudulent inducement to enter a contract generally has two options for relief — "(1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Novare Grp., Inc. v. Sarif*, 290 Ga. 186, 188 (2011).

Like Pennsylvania, Georgia follows the justifiable reliance standard, but Georgia imposes a more rigorous test than described by the Supreme Court in *Field*. 516 U.S. at 70-72. To

33

establish justifiable reliance under Georgia law, a party must show that he exercised "his duty of due diligence." *Nebo Ventures, LLC v. NovaPro Risk Sols., L.P.*, 324 Ga. App. 836, 840 (2013). "Except in plain and indisputable cases, questions of fraud and whether a [claimant] could have protected himself through the exercise of ordinary diligence are . . . for [the factfinder at trial]." *Harris v. F.D.I.C.*, 2014 WL 4925689, at *6 (N.D. Ga. Sept. 30, 2014) (quoting *Lester v. Bird*, 200 Ga. App. 335, 338 (1991)).

A "plain and indisputable" instance of a party's failure to exercise due diligence occurs when the party claiming fraud fails to examine documents in his possession to discover the truth. *See Gospel Tabernacle Deliverance Church, Inc. v. From the Heart Church Ministries, Inc.*, 312 Ga. App. 355, 358-59 (2011) (hereinafter, "*From the Heart*"). In *From the Heart*, the court held that a church purchasing property could not establish justifiable reliance on the seller's misrepresentations about property boundaries, because the church had in its possession a survey of the property and other documents clearly displaying the parameters. *Id.* This constituted "plain and indisputable" evidence that the church "failed as a matter of law to exercise due diligence . . . ." *Id.* (noting that a party cannot claim fraud when "he could have learned the truth . . . and . . . avoided damage") (quoting *Lester*, 200 Ga. App. at 338).

Further, "[i]t is well-settled law in Georgia that a party who has the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of his signature to the instrument based on oral representations that differ from the terms of the contract." *Novare Grp.*, 290 Ga. at 188-89 (internal quotations omitted) (citing *Craft v. Drake*, 244 Ga. 406, 407 (1979)). For example, the plaintiff homeowner in *Craft* could not prevail on a fraudulent inducement claim, because the statements made by the bank's agent about not using the plaintiff's home as collateral were "directly contrary" to the language in the note signed by

the plaintiff. 244 Ga. at 407. Similarly, here, the PNC loan officers' alleged misrepresentations about Mwangi's personal liability directly contradict the plain language of the 2014 Mwangi Guaranty, which clearly lays out Mwangi's personal liability for Dominion's debts to PNC. (2014 Mwangi Guaranty.)

A party can only be relieved from his duty to read a written contract where, by fraud, another party prevents him from reading the agreement. *Novare Grp.*, 290 Ga. at 189 (citing *Beckwith v. Peterson*, 227 Ga. 403, 404 (1971)). Even if the PNC loan officers pressured or rushed Mwangi to sign the loan documents — a bald assertion by Mwangi unsupported by additional evidence — Mwangi has not alleged that PNC committed any fraud that actually prevented him from reading the loan documents in his possession. (Mwangi's Opp'n at 3; Mwangi Decl. ¶¶ 4-5); *see Craft*, 244 Ga. at 407 (denying plaintiff's fraud claim, because he "alleged no fraud which would have prevented Craft from reading the agreement before signing it"); *Beckwith*, 227 Ga. at 404 (plaintiff provided no legal excuse for not reading a deed; therefore, could not establish fraud).

On March 18, 2014, Mwangi emailed Kingsley, inquiring about the Visa Commercial Card Agreement, which Mwangi "hop[ed] to execute . . . before [he left that] Friday for a one week trip." (Mwangi-Kingsley Emails at 2-3.) On March 21, 2014, Kingsley emailed Mwangi back, letting him know that the Visa Commercial Card Agreement would likely be sent to him the following week. (Mwangi-Kingsley Emails at 2.) Finally, on April 9, 2014, another PNC representative emailed the Visa Commercial Card Agreement, the 2014 Mwangi Guaranty and the 2014 Brun Consent of Guarantor to Mwangi. (Mwangi-Kingsley Emails at 1-3.) The PNC representative thanked Mwangi for his patience and asked Mwangi to print, sign and return the documents. (Mwangi-Kingsley Emails at 1.)

Notably, PNC did not give Mwangi a deadline to return the signed documents or otherwise try to prevent Mwangi from reading the agreements. (Mwangi-Kingsley Emails at 1.) Rather, the PNC representative wrote, "[o]nce all documents have been completed, please return them to the return address listed below." (Mwangi-Kingsley Emails at 1.)

Like the church that failed to exercise its due diligence in *From the Heart*, the Court finds it "plain and indisputable" here that — by either failing to read, or reading and ignoring the contents of, the 2014 Mwangi Guaranty — Mwangi did not exercise his due diligence. 312 Ga. App. at 358-59. Because he cannot show justifiable reliance, Mwangi's claim for fraudulent inducement fails under Georgia law and leaves him with no grounds to rescind the 2014 Mwangi Guaranty.

Lastly, the 2014 Mwangi Guaranty contains a merger clause, providing that "[t]his Guaranty . . . constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between [Mwangi] and [PNC]." (2014 Mwangi Guaranty § 15); *Harris*, 2014 WL 4925689, at *7 (noting that the plaintiffs' loan documents contained merger clauses, which cut against their argument that they reasonably relied on the defendant's misrepresentations). Again, had Mwangi read the Guaranty that he signed, he would have seen that the terms of the Guaranty negated any discussions that he and PNC might have had about its terms.

In sum, assuming the facts in the light most favorable to Mwangi, he can show neither reasonable reliance under Virginia law, nor justifiable reliance under Pennsylvania and Georgia law. Because Mwangi cannot establish this essential element of fraud in the inducement, he has no defense to PNC's breach of contract claims and remains liable for Defendants' defaults under the Loan Documents.

36

## V.  DAMAGES

Having established Defendants' breach of the Loan Documents and default on the four

commercial loans, the Court must next determine PNC's damages. In its Motion for Summary

Judgment, PNC seeks the following relief:

> (i) Judgment on Count I of the Amended Complaint, in the total amount of $620,015.18, plus interest accruing at an adjusted rate of 6.25% per annum from November 30, 2017 until paid; and (ii) Judgment on Count II of the Amended Complaint, in the total amount of $201,893.98; and (iii) Judgment on Count III of the Amended Complaint, in the total amount of $294,883.19, plus interest accruing at a rate of 4.36% per annum from November 30, 2017 until paid; and (iv) Judgment on Count IV of the Amended Complaint, in the total amount of $141,185.76, plus interest accruing at a rate of 3.99% per annum from November 30, 2017 until paid[.]

(PNC's Mot. for Summ. J. at 3; PNC's Mem. at 17.) Further, PNC requests attorneys' fees in the

total amount of $19,154.00, "plus all court costs associated with this action." (PNC's Mem. at

17, Ex. B (Affidavit of Richard I. Hutson, Esq.) ("Hutson Affidavit").)[12]

Defendants offered no response to PNC's calculation of damages, including the different

interest rates applied to the commercial loans and attorneys' fees. To avoid further dispute, the

Court will issue an order accompanying this Opinion that instructs the parties to meet and confer

for the purpose of tendering a joint proposed final judgment order.

---

[12]       PNC retained the Law Offices of Weinstock, Friedman & Friedman, P.A. ("WFF") to work on this matter. (Hutson Aff. ¶¶ 2, 5.) Richard I. Hutson ("Hutson") works for WFF. (Hutson Aff. ¶ 2.) In his affidavit, Hutson listed the number of hours that attorneys and paralegals at WFF worked on this matter and the rates that they charged. (Hutson Aff. ¶¶ 8-10.) Hutson stated that the amount requested by PNC constitutes reasonable attorneys' fees, "commensurate with the hourly rates of other lawyers and paralegals in the Eastern District of Virginia working on similar matters." (Hutson Aff. ¶ 11.)

## VI. CONCLUSION

For the reasons set forth above, the Court finds that Defendants failed to establish a genuine issue of material fact. Therefore, the Court GRANTS PNC's Motion for Summary Judgment (ECF No. 25). An appropriate Order shall issue.

It is so ORDERED.

_____/s/_____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: April 11, 2018